**UNITED STATES of America, Appellee,**

v.

**Stephen C. TWOMEY, Defendant, Appellant.**

**No. 88–1549.**

United States Court of Appeals, First Circuit.

Heard Jan. 9, 1989.

Decided Sept. 8, 1989.

---

* Of the District of Massachusetts, sitting by designation.

Robert D. Richman, Federal Defender Office, for defendant, appellant.

F. Dennis Saylor, IV, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., was on brief for appellee.

Before SELYA, Circuit Judge, and ALDRICH, Senior Circuit Judge, and PETTINE, Senior District Judge.[*]

PETTINE, Senior District Judge.

Defendant-appellant Stephen C. Twomey appeals his jury conviction in the United States District Court for the District of Massachusetts for possession of a firearm by a convicted felon, in violation of the Armed Career Criminal Act. See 18 U.S.C. App. II sec. 1202(a). Appellant bases his plea for reversal and remand for retrial on two grounds: first, that the district court erroneously admitted evidence obtained as the result of a warrantless, coerced search of appellant's parents' home; second, that the district court unfairly mischaracterized the evidence and belittled the theory of defense in its jury instruction. Alternatively, appellant requests that his fifteen-year mandatory sentence be vacated and the case remanded for resentencing on the ground that he was improperly subjected to the sentencing provisions of section 1202(a) and would have received a significantly less harsh sentence under a modified version of the law re-enacted after his indictment and retroactively applicable to his case. See 18 U.S.C. sec. 924(e). We both affirm appellant's conviction and decline to vacate his sentence.

## THE FACTS

On August 31, 1987, appellant Stephen C. Twomey was indicted on a single count of possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Appendix II Section 1202(a)(1). The

[*] Of the District of Rhode Island, sitting by designation.

record before us reflects that the events leading to this indictment began on November 4, 1985 with the theft of firearms from the Worcester, Massachusetts, home of Ralph Hall, the owner of a large collection of guns. Three days after the burglary, on November 7, 1985, Trooper Thomas B. Duffy of the Massachusetts State Police Crime Prevention and Control Unit received information from a confidential informant that appellant had in his possession several firearms that had been taken during a break-in of a residence in Worcester. According to the informant, appellant had himself participated in the break-in and was storing the weapons at 7 Maplewood Road in Worcester, Twomey's parents' home and Twomey's own permanent home address and usual residence at that time.

### 1. *The Search*

After receiving confirmation from the Worcester Police Department that a break-in involving the theft of firearms had occurred in Worcester three days earlier, Trooper Duffy and several other state troopers went to the Twomey residence late in the afternoon of November 7, 1985 and, after a brief surveillance, arrested appellant outside the residence on an outstanding default warrant arising out of an unrelated case. When, in the course of questioning, Twomey denied any knowledge of or involvement in the burglary or any knowledge as to the whereabouts of the stolen weapons, Trooper Duffy decided not to pursue the matter with appellant and thus did not seek his consent to search the house. Instead, Trooper Duffy and a second trooper, Corporal Rand, went to the front door of the 7 Maplewood Road residence to speak with the senior Twomeys.

What happened next is a matter of some dispute. At a hearing held on December 3 and December 10, 1987 to consider Twomey's October 5, 1987 motion to suppress the firearms as the fruit of an illegal search, Trooper Duffy testified that, in response to either the troopers' knock or ringing of the bell, appellant's parents, Joseph and Cecilia Twomey, came to the door and, after introductions, were informed that their son was under arrest and that the troopers would

like to speak with them further. At this point, the Twomeys invited the troopers into their home, and the troopers followed them into the kitchen.

Once in the kitchen, the troopers made it known to the Twomeys that they had information linking their son to a break-in during which a number of guns had been stolen and further explained that they had reason to believe that a number of those weapons were currently in the Twomey home. According to Trooper Duffy, the following exchange then took place:

It was further related to them that it was our intention to obtain a search warrant for the home, and at that point, I believe it was Mr. Twomey that interrupted and said, that won't be necessary, you can go ahead and check. And I further indicated to them that they could require it, us to get a search warrant, that we did not have a search warrant in our possession at that time. Again, it was related by, I believe Mr. Twomey, possibly Mrs. Twomey, that won't be necessary.

At that point, I think it was Sergeant [sic] Rand that indicated to them that they could give a voluntary consent of their home if they so wished and that he would draft up a handwritten consent search for them to sign before we would proceed. That was agreeable to the parents.

Duffy described the Twomeys during this conversation as "extremely courteous", "almost apologetic", and "concerned". Duffy also testified that during this exchange the Twomeys indicated that they knew of their son's criminal history and his use of illegal drugs, and that as a result they randomly checked his room for narcotics or contraband and had done so recently, finding nothing.

According to Trooper Duffy, Sergeant [sic] Rand then drafted a handwritten consent form which stated in relevant part:

We (Joseph C. Twomey & Cecilia M. Twomey) do freely and voluntarily give our consent to Cpl Richard Rand and Trooper Thomas Duffy permission [sic]

to conduct a search of 7 Maplewood Rd Worcester[,] our residence. We have not been made any promises in consideration for our consent.... The police officers have stated to me that they (police) do not have a search warrant and also that [sic] I have been advised that I (we) can require the police to obtain a search warrant before conducting any search of 7 Maplewood Road Worcester.

The written consent was then read aloud to the Twomeys, after which they were given the opportunity to read it themselves. After making two minor changes to the document, both Mr. and Mrs. Twomey executed the consent. The troopers then searched the house, finding two rifles and a shotgun in the attic.

The Twomeys' version of these same events is markedly different. Testifying first at the suppression hearing, Joseph Twomey stated that he met the troopers on the front porch of the 7 Maplewood Road residence, that he was angry and that he initially informed the troopers that "if they didn't [have a search warrant], they weren't going to get in the house." After the troopers "soft-talked" him into calming down, however, Mr. Twomey agreed to sign the consent to search because, "I presumed they would get a warrant and they would search the house anyway.... I felt they would get a warrant ... because I was told they would get a warrant." Although Mr. Twomey admitted that he was not forced to sign the consent through threats or intimidation, and that he had the opportunity to read and make changes to the written consent document, he also stated that he felt coerced to sign the consent in the sense that he perceived that the house would be searched whether he signed the form or not.

Cecilia Twomey, who was sequestered during her husband's testimony, corroborated certain details of her husband's account of the events of November 7, 1985. Describing Joseph Twomey as "very nervous and angry and upset," she confirmed that her husband initially informed the police, "You're not getting in without a warrant." Mrs. Twomey also reported hearing

the police state that, "We can get a search warrant, we can go get a search warrant and come back." However, Mrs. Twomey shed no light in her testimony on what finally convinced her and her husband to sign the written consent.

Based on this testimony, as supplemented by a subsequent affidavit and further cross-examination of Trooper Thomas Duffy, the district court found the Twomeys' consent to the search to be free and voluntary and denied the motion to suppress.

### 2. *The Jury Instruction*

Appellant was tried before a jury on February 22–23, 1988. Included in the case against appellant was the testimony of Ralph Hall, who testified to the nature of his gun collection and the circumstances of the break-in; the testimony of Trooper Duffy, who testified concerning defendant's arrest, the search of the 7 Maplewood Road residence, and defendant's subsequent admission that he had broken into a Worcester residence and stolen firearms; and various exhibits, among them a signed statement transcribing appellant's confession to Trooper Duffy and the guns found at 7 Maplewood Road.

At the close of the government's case, the defense recalled Mr. Hall and called two Worcester police officers in an attempt to impeach Hall's testimony concerning the circumstances of the break-in and the accuracy of the information he had provided to the police. Through these witnesses, the defense established seven inconsistencies in Hall's testimony, five going to the precise identity of the items stolen during the break-in, one going to the condition of the premises after the burglary and one going to Hall's failure to tell the police that he suspected a family friend of involvement in the theft. The overall thrust of the defense effort was to discredit Hall as a witness, then leverage the inconsistencies in his testimony to discredit appellant's confession as well.

In its instructions to the jury, the district court specifically addressed the inconsistencies in Hall's testimony in the context of explaining to the jury its obligation to as-

sess the credibility of the witnesses. The judge then went on to describe in considerable detail how the jury was to weigh and evaluate the prior out-of-court statements made by Mr. Hall around the time of the break-in and subsequently proffered by the defense to undermine the credibility of his in-court testimony. In thus instructing the jury, the court used examples from the evidence in the case at bar to illustrate the application of the law regarding prior inconsistent statements.

Armed with its instructions, the jury deliberated for fifty-nine minutes before finding appellant guilty of possession of a firearm in violation of the Armed Career Criminal Act.

### 3. *The Sentence*

Appellant's sentencing hearing was held on May 11, 1988. At the hearing, the government introduced evidence of six prior convictions of defendant, two for breaking and entering in the nighttime, in violation of Mass.Gen.Laws Ann. c. 266, sec. 16 (West 1970); two for breaking and entering in the daytime, in violation of Mass.Gen. Laws Ann. c. 266, sec. 18 (West 1970); and two for armed robbery, in violation of Mass.Gen.Laws Ann. c. 265, sec. 17 (West 1970). On the basis of these convictions, the government argued that appellant was a "career criminal" subject to the sentencing enhancement provisions of the Armed Career Criminal Act. Specifically, the statute provides that any person convicted under section 1202(a) who has three prior convictions for "robbery" or "burglary" or both is subject to a 15–year minimum mandatory sentence of imprisonment without parole. Appellant attempted to counter the government's contention by arguing that, between the time of the commission of the offense and the time of his indictment, Congress has repealed 18 U.S.C. App. II sec. 1202 and thus the applicable sentencing statute was the reenacted Armed Career Criminal Act, codified at 18 U.S.C. sec. 924(e). Under the new version of the law, appellant argued, the prior breaking and entering convictions would not constitute predicate offenses for purposes of sentence

enhancement, and thus he would be subject to a much reduced sentence.

The district court held that section 1202(a), not section 924(e), applied to appellant. The court also found that appellant had four prior convictions that qualified as predicate offenses under section 1202(a), excluding one conviction for breaking and entering in the nighttime because the record was silent as to whether defendant was represented by counsel and treating the two armed robbery convictions as a single conviction because they arose out of a single incident. The court then sentenced defendant to fifteen years in prison without parole, the mandatory minimum sentence under section 1202(a).

### THE ISSUES ON APPEAL

#### 1. *The Search*

■ Appellant challenges the warrantless search of his parents' home on the ground that it was coerced by Trooper Duffy's statement concerning the intention of the police to get a warrant to search the house if the Twomeys' permission to search was not forthcoming. Appellant's principal argument is that the Trooper's statement was inherently coercive because, by suggesting that a warrant would automatically issue, it led the Twomeys to believe that their withholding of consent would be a futile gesture, delaying but not preventing the search. In the alternative, appellant argues that, even if the suggestion that a warrant will inevitably issue is not on its face coercive, it was coercive in this particular case because there was no probable cause to support a search warrant and thus the Trooper's statement was an artful deception designed to induce the Twomeys' consent through trickery.

In a search such as this one, where the consenting party is not in custody and the government attempts to justify a warrantless search on the basis of consent, the Fourth and Fourteenth Amendments of the Constitution clearly require that the consent be freely given and is not the result of duress or coercion, either express or implied. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36

L.Ed.2d 854 (1973). Whether such consent was voluntary or was the result of coercion is a question of fact to be determined from an examination of all the circumstances surrounding the securing of the consent. *Id.* at 227, 93 S.Ct. at 2047. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980). Among the factors that a court should consider in conducting its investigation into the voluntariness of a consent to search are the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place. *Schneckloth,* 412 U.S. at 227, 229, 247, 93 S.Ct. at 2047, 2048, 2058. *See also Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (whether the consenting party was of a sufficient age, maturity and mental capacity); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (whether the police were acting under a baseless claim of authority). The Supreme Court has further admonished that the lower courts should engage in only "the most careful scrutiny" in making such determinations. *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048.

Even against the backdrop of the demanding scrutiny required by the *Schneckloth* Court, we find no clear error in the district court's assessment of the totality of the facts and circumstances in this case. *United States v. Kimball,* 741 F.2d 471, 474 (1st Cir.1984). Against Trooper Duffy's allegedly coercive statement that the police intended to obtain a search warrant for the home, the district court weighed the language of the written consent form, in which the Twomeys explicitly stated that they gave their consent freely and voluntarily; the Twomeys' awareness of the necessity for a warrant and of their right to decline the search; the candor of the police in informing the Twomeys that they did not in fact have a search warrant and could be required to obtain one; the opportunity that the Twomeys had to review the consent form with the police and on their own,

and to make changes to its content; and its general observations of the credibility and demeanor of Trooper Duffy and the Twomeys. Such a "careful sifting of the unique facts and circumstances" of the case is precisely the kind of scrupulous analysis envisioned in *Schneckloth* and, given the obvious care taken by the district court in undertaking this analysis, we see no reason to disturb its judgment. *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050.

More specifically, the comments by the district judge indicate that, while he did appreciate the fact that certain words can, in context, have inherently coercive effect, he explicitly found that the words complained of here, "particularly in this context," were not coercive in any sense. This Court agrees with the district court that the facts and circumstances of this case, when taken as a whole and despite the precise words spoken by the police in their interaction with the Twomeys, show that, rather than being coercive, "the transaction which led to the consent ... was proper; in fact, scrupulous." Further, this Court declines to adopt the approach to the analysis of the coerciveness of police statements urged by the appellant but rejected by the district court, an approach based on intensive textual analysis which would, in effect, prescribe the precise form of language that police must use in encounters such as this one. The contextual analysis undertaken by the district court is the better method for assuring the absence of police coercion in such cases, while still providing law enforcement agencies with the flexibility that they require to meet the legitimate need for such searches. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047. *See generally Kimball,* 741 F.2d 471 (1st Cir.1984) (district court's finding of voluntary consent not clearly erroneous in light of totality of the circumstances, including police officer's statement that agents would go in search of a warrant if permission to search refused); *United States v. Miller,* 589 F.2d 1117, 1132, n. 13 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (in context of all the criteria of voluntariness set forth in

*Schneckloth,* federal agent's assertion that he would seek a warrant if appellant did not consent did not alone render consent involuntary).

As to appellant's second argument (i.e. that a statement of intent to secure a search warrant, if not per se coercive, is coercive where, as here, there is no probable cause to support a warrant), we again conclude that the district court's finding that there was no deceit or trickery of any kind in the interaction between the police and the senior Twomeys was not clearly erroneous and survives review. The district court based its conclusion on both the fact that Trooper Duffy's statement of intent to obtain a warrant was well-founded in that a warrant would have issued in this case, and the fact that Trooper Duffy's statement was an honest expression of his good-faith belief that a warrant would issue. Since we decline to second guess the district court in its finding, based on the information provided by a reliable, confidential informant, as corroborated by the Worcester Police Department, that a warrant would issue here, we need not reach the issue of whether Trooper Duffy's good-faith belief that a warrant would issue, even if mistaken, would alone suffice to defeat a claim of coercion in a case such as this.

2. *The Jury Instruction*

■ Appellant argues that the trial judge's instructions on how to evaluate the inconsistencies that surfaced during trial between Ralph Hall's prior out-of-court statements and his in-court testimony, resulted in a mischaracterization of appellant's evidence and a belittling of appellant's theory of defense. Specifically, appellant voices a melange of objections to the court's remarks, attacking the phrasing of the judge's general comments on the import of inconsistencies in the evidence, the court's use of examples from the trial evidence to illustrate the evidentiary value of prior inconsistent statements and the court's juxtaposition of its instruction on Hall's prior out-of-court statements with that on appellant's out-of-court confession during interrogation.

We note at the outset that appellant has made no objection to the accuracy of the district court's statements of the law applicable to his case. Instead appellant is arguing, in effect, that the cumulative impact of the several errors complained of is unfair to appellant's case and unduly favors the government's. Having reviewed the district court's charge as a whole, we cannot agree with appellant's assessment of the instructions given. *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975); *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *United States v. Serino,* 835 F.2d 924, 930 (1st Cir.1987).

The district court was, at the outset, careful to explain the jury's role as the sole judge of the credibility of the evidence before turning to the task of instructing the jurors on the law to be applied in carrying out this task. On the specific problem of how to weigh inconsistencies in the evidence before them, the judge explained:

Now, that brings me to this question of inconsistencies that have been referred to in the arguments of counsel. And you should understand that in virtually every case, there will be inconsistencies in the evidence, just as there are inconsistencies between different witnesses or between the evidence as presented by one witness and the evidence as presented by certain evidence or other witnesses. Those inconsistencies, if you find that they are really inconsistencies, may or may not bear on the believability of a witness's trial testimony.

Sometimes differences in the evidence are the result of different abilities to recall or to perceive at a different time, or they may be indications that you have to evaluate that somebody's contriving a story, that somebody's making something up. When you're faced with those inconsistencies, if you find them, you have to decide what kind of explanation is appropriate for them. And common sense, once again, tells you that you should, may take into consideration whether or not a particular witness has a

reason to lie or to color its story or to present a somewhat different perspective on the evidence in the case.

This instruction was followed with an explanation of the proper use to be made of prior inconsistent statements not made under oath, and these points were illustrated with an example drawn from Ralph Hall's own testimony. The court concluded by distinguishing the effect to be given to appellant's out-of-court confession from the effect to be given to Hall's prior out-of-court statements.

Taken as a whole, the district court's instructions were comprehensive, accurate and balanced. In commenting generally on evidentiary inconsistencies, the judge noted clearly that they went to the believability of testimony and should be considered by the jury in this regard. In illustrating its instructions, the court did no more than assist the jury by demonstrating to them how to go about analyzing the evidence. *See, e.g., Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); *United States v. Silvestri,* 790 F.2d 186, 189 (1st Cir.), *cert. denied,* 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986). It put no conclusions in the jurors' heads and betrayed no bias as to the weight of the evidence before them. There is simply nothing in the instructions that resulted in distortion of the evidence, negation of appellant's arguments or unfairness to either party.

### 3. *The Sentence*

Appellant makes a two-tiered argument for reducing his sentence from the mandatory fifteen-year sentence under section 1202(a) of the 1983 version of the Armed Career Criminal Act to a two-year sentence under section 924(e) of the 1986 amended version of the Act. First, appellant argues that, in enacting section 924(e), Congress eliminated breaking and entering from the roster of predicate offenses triggering sentence enhancement, and thus appellant, if sentenced under the new statute, would not be labeled a career criminal and would receive a much reduced sentence. Second, appellant contends that section 924(e), which was enacted after the date of his offense but before his indictment and sentencing, applies retroactively to his case under the terms of the federal saving statute.

Logically, the first question facing this Court is whether it makes any difference which version of the Armed Career Criminal Act appellant is sentenced under. If appellant is wrong, and breaking and entering remains a predicate offense for the purpose of sentence enhancement under section 924(e) as the government contends, then he is subject to the fifteen-year penalty regardless of which statute he is sentenced under and his retroactivity argument is moot.

In *United States v. Patterson,* 882 F.2d 595 (1st Cir.1989), this Court was faced with the exact question of whether prior convictions for breaking and entering under Mass.Gen.Laws Ann. c. 266, secs. 16 and 18 (West 1970) qualify as predicate convictions triggering sentence enhancement pursuant to the Armed Career Criminal Act, 18 U.S.C. sec. 924(e). We decided in that case that these convictions do indeed qualify as predicate convictions under the catch-all provision of the new statute, section 924(e)(B)(ii). We simply apply that result today to dispose of appellant's claim. Thus it matters not whether appellant is sentenced under section 1202(a) or section 924(e); in either case, he is subject to sentence enhancement as a career criminal. We therefore affirm the district court's sentence of fifteen years in prison without parole.

For the foregoing reasons, the judgment of the district court is AFFIRMED.