**UNITED STATES of America**

v.

**Leslie E. ROBERTS, Defendant.**

**Crim. No. 92–6–P–C.**

United States District Court,
D. Maine.

Feb. 3, 1993.

---

Jonathan A. Toof, Asst. U.S. Atty., Portland, ME, for plaintiff.

Richard S. Emerson Jr., Childs Emerson, Portland, ME, for defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Chief Judge.

In a two count indictment, Defendant has been charged with manufacturing more than 1000 marijuana plants and with possession with intent to distribute more than 1000 marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). He has moved to suppress physical evidence taken following a warrantless search of his property and statements made by him as a result of the entry onto his property or as a result of his arrest. An evidentiary hearing on the motion was begun on December 22, 1992, and completed on January 25, 1993.

The evidence shows that Maine State Game Warden Albert St. Saviour received information from an informant, who had previously provided reliable information to him, that large amounts of marijuana were located in a certain area of Porter, Maine. The informant said that the marijuana was located near a bog above Black Pond off Meeting House Road. Warden St. Saviour went to the designated location and observed more than two hundred marijuana plants of varying heights growing in buckets. He described the location as being an old field in the woods across a public road from Defendant's house. The field was about seventy-five yards from the edge of the road. At intervals along the road at the edge of the woods there were a number of handmade no trespassing signs. Young plant growth was between the marijuana and the road. Warden St. Saviour reported the marijuana growing operation to Oxford County Deputy Sheriff Christopher Wainwright.

Deputy Wainwright had received other information that perhaps marijuana was growing in the area and tips that Defendant had been buying large quantities of potting soil. On August 26, a few days after receiving the information about the marijuana from Warden St. Saviour, Deputy Wainwright went to investigate the area. He too found the marijuana in a field overgrown with "popple trees, junk trees, trees that grow up rather rapidly in a field that is not attended, and also pine type shrubs, shrubbery trees that were growing just wild." He further described it as "totally unkept, the only thing kept up would be the marijuana plants themselves." Wainwright determined that the marijuana growing operation was related to Defendant's house because the house was visible from the field and there were tracks leading down Defendant's driveway and resuming at the appropriate angle across the road from the house to go to the growing area. The driveway to the house from the road was approximately 50–75 feet long.

Wainwright, who had arrived with Deputies Frank and Timothy Ontengco called for reinforcements. Deputies Ben Conant and Ralph Sarty arrived, they parked a sheriff's cruiser and a pickup truck in Defendant's driveway, and went to the house to investigate. Defendant came out of the

house, and Deputy Sarty told him they were there because they suspected marijuana was being cultivated on the property. From where Sarty was standing in Defendant's yard, he could look up forty-five to seventy feet and see marijuana growing by the shed. He then advised Defendant of his constitutional rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant replied that he understood the rights being explained to him and had no further questions. He told Sarty that he wanted to talk. Conant asked Defendant to sign a consent form which would permit the officers to search his property and house. The consent form stated, *inter alia,* that the signatory "had been advised of his constitutional rights to refuse such consent and to require that a search warrant be obtained prior to any search." Deputy Conant explained the form to Defendant, and he signed it without any questions.

The officers then conducted a search of Defendant's property, finding large quantities of marijuana behind the house, and beside the shed. In one of Defendant's trucks were a number of containers like those in which the marijuana plants were growing, loose marijuana, potting soil and fertilizer. When Sarty asked Defendant why he was growing marijuana, he answered that he had no social security and no money and that he had to make money somehow.

■ Defendant first asserts that the Deputies conducted an illegal search of the curtilage of his home by entering the curtilage without a warrant. The curtilage is that portion of land "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1140, 94 L.Ed.2d 326 (1987). In *Dunn* the Supreme Court suggested four factors to be considered in determining the extent of the curtilage surrounding a home: the proximity of the area to the home; (2) whether the area is within an enclosure surrounding the home; (3) the nature and uses to which the area is put; and (4) the

steps taken by the resident to protect the area from observation by passersby. *Id.*

■ Consideration of these factors makes plain that the overgrown field containing the marijuana plants on the south side of Meeting House Road was not within the curtilage of Defendant's home. The field was at least seventy-five yards from the edge of Meeting House Road and the house was another twenty to twenty-five yards up the driveway on the opposite side of the road. In *Dunn,* the Supreme Court found that a barn sixty yards from Defendant's home was too far away to be treated as an adjunct of the home. *Id.* at 301, 107 S.Ct. at 1139. Also, the field in which the marijuana here was growing was not within an enclosure surrounding the house. In fact, it was across a public road from the house.

The overgrown field on the south side of Meeting House Road where the first marijuana was found does not appear from the deputies' descriptions to be used for any of the intimate activities associated with the house. *See Oliver v. United States,* 466 U.S. 170, 179–80, 104 S.Ct. 1735, 1741–42, 80 L.Ed.2d 214 (1984). Rather, it appears plainly to be an open field which has been put into service for growing marijuana. Finally, although Defendant apparently put several hand-lettered no trespassing signs on Meeting House Road, no trespassing signs do not confer a reasonable expectation of privacy in activities taking place in otherwise open fields. *See id.* Here, the area was accessible through old logging roads through the woods and was covered with just the natural growth that occurs in old overgrown field areas. On balance, therefore, the Court finds that Defendant did not have a reasonable expectation of privacy in the portion of his property in which the marijuana was being cultivated. Rather, the area must be considered an open field rather than curtilage.

The deputies did enter the curtilage of Defendant's home after discovering the marijuana in the open field across the road. The Court of Appeals for the First Circuit has determined that policemen may lawfully enter a person's property and approach

**24**

his home in order to interview him. *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir.1990). The deputies were, therefore, doing nothing unlawful in entering Defendant's driveway to speak to him.

■ A number of the items Defendant seeks to suppress, including more marijuana, were in plain view of the officers once they were in Defendant's yard. Very soon after the deputies arrived, however, Defendant also had explained to him and executed a consent form permitting them to search his property. Defendant argues that the consent was not voluntary. "The question whether a consent to search [is] in fact 'voluntary' or [is] the result of duress or coercion is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). Factors to be considered in making the determination of voluntariness are whether the person giving consent knew of the right to refuse, his possibly vulnerable subjective state and any evidence of inherently coercive tactics in the questioning or in the questioning environment. *United States v. Twomey*, 884 F.2d 46, 51 (1st Cir.1989).

■ The consent form signed by Defendant here and explained to him by Deputy Conant recites that he knows of his right to refuse. The testimony of the deputies, which is the only testimony concerning the circumstances extant when Defendant was asked to sign the consent form, does not show inherently coercive tactics used by the officers. Although there were a number of deputies on the scene, they were solicitous of Defendant's well-being on a hot August day and, in fact, did not pat him down or otherwise act to intimidate him. Also, all the questioning took place in Defendant's dooryard, a nonthreatening environment. The primary issue raised by Defendant at the evidentiary hearing addresses the fourth factor, his vulnerable subjective state. He asserts that he lacks the mental capacity to understand his rights and that he could not, therefore, have waived them by signing the consent form. Having heard the evidence, the

Court finds that Defendant had adequate mental capacity to understand his rights and the consequences of waiving those rights, as they were explained to him.

All the officers who had contact with Defendant testified that he had no difficulty communicating with them over the more than five hour period they were investigating his property and seizing the marijuana plants found. They also testified that Defendant appeared to have no difficulty understanding them when they spoke to him.

Defendant, on the other hand, presented testimony of three witnesses, a psychiatrist and two persons from the town of Porter who have provided assistance to Defendant, to the effect that he is a simple, uneducated backwoodsman, with a mental defect rendering him unable to understand his rights. Dr. Richard Evans testified that Defendant is a schizophrenic, "like the village idiot," whose social development ceased at age seven or eight. He testified that even if they were explained to him, Defendant would be unable to understand the concept of constitutional rights, *Miranda* rights, or the right to refuse to consent. Describing his own interaction with Defendant, Dr. Evans stated that he had difficulty getting Defendant to answer, that he does not think Defendant understood the questions asked, or the nature of the interview. He testified that Defendant's ability to interpret the questions asked of him was limited and as often as not his interpretations were bizarre.

The Court did not find Dr. Evans to be a convincing witness. He changed his diagnosis between the time he wrote his report and the time he testified, presenting a more severe diagnosis at the time of the hearing. Moreover, his demeanor was rather flippant, and he sometimes had difficulty giving specific examples of Defendant's behavior that gave rise to his diagnosis.

Defendant's other witnesses were David DeMello and Juanita DeMello, two Good Samaritans from Porter who try to assist the elderly poor of that town. After Defendant's arrest, the DeMellos assisted him in his dealings with his lawyers and with the federal bureaucracy. Both DeMellos

described Defendant as an unsophisticated backwoodsman who does not read or write. David DeMello testified that Defendant must have things explained to him repeatedly to make sure he understands and that information must be teased out of him. Juanita DeMello testified that she had seen Defendant answer questions, only to discover later that he had not understood what had been discussed.

There is clearly a conflict between the testimony of Defendant's witnesses regarding his competency and that of the officers who spent time with him on the day of his arrest. The Court finds most persuasive, however, the testimony of Deputy Christopher Wainwright and former Maine Drug Enforcement Agency officer Winston McGill. Both were highly credible, straightforward witnesses. Deputy Wainwright, who had the opportunity to observe and interact with Defendant for several hours, testified that he had no difficulty communicating with Defendant. Deputy Wainwright testified that Defendant was angry when confronted about the marijuana plants, but was calm as the day wore on and he was "talking back and forth," Tr. 34, with Wainwright and the other deputies. Deputy Wainwright testified that at one point, Defendant was sitting in his car and it became clear that he was trying either to retrieve something from under the seat or put something there. When the officers investigated, they discovered two purses filled with large amounts of cash. This behavior by Defendant indicates that he understood the situation he was in and was trying to conceal cash from the persons searching his property.

Mr. McGill testified that he arrived at the scene later in the afternoon and again read the *Miranda* warnings to Defendant. He said that Defendant was very quiet, but appeared to understand and acknowledged understanding each of the warnings. Defendant told McGill he would talk to him, and they discussed the marijuana growing operation. In response to McGill's questions, Defendant stated that he had learned about it from television and that he had gotten seeds from a mail order house in California, which he had learned of from a magazine. Defendant asked McGill how serious the offense was. McGill testified that Defendant's conversation was focused and that he did not ramble.

Defendant's responses to McGill and his response to the officer who asked him why he was growing marijuana indicate that he knew what was going on and that he is more sophisticated than either Dr. Evans or the DeMellos testified.[1] The Court notes too that Juanita DeMello testified that when Deputy Timothy Ontengco asked Defendant on a subsequent occasion if he could search his vehicle again, Defendant refused, telling Ontengco he had searched quite enough. Again, Defendant's response was situationally appropriate, indicating that he has the capacity to understand his circumstances and make deliberate choices.[2]

The Court finds, therefore, that Defendant was competent to waive his rights and that the consent he gave to the deputies to search his property was valid. The Court also finds that Defendant had the capacity to and did understand the *Miranda* warnings which were given to him and that he knowingly and intelligently waived his

---

**1.** In fact, David DeMello testified that if Defendant had said he grew the marijuana for money because he did not have Social Security, he was quicker than DeMello had given him credit for being. Dr. Evans testified that if Defendant had made those responses, they indicated that he could come up with thoughts sometimes. He testified that such responses would not be inconsistent with schizophrenia but that Defendant could not have come up with the responses himself. It seems clear to the Court, however, that Defendant's statements, which were spread out during the afternoon, were appropriate responses by him to the situation and to the specific questions asked. They do not appear to be responses prompted by anyone else.

**2.** Juanita DeMello testified that after this incident Defendant expressed wonder to her that he was able to thwart the search by refusing, saying that he had not realized that before. The Court finds no other evidence in the record that Defendant did not understand his right to refuse when it was explained to him by the deputies, and thinks that his comment to DeMello might reflect his wish that he had refused before.

right to remain silent or to have an attorney with him during questioning.

Accordingly, it is ORDERED that Defendant's motion to suppress be, and it is hereby, DENIED.

SO ORDERED.