**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 20, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSE LUIS GONZALEZ-RAMIREZ
a/k/a Jose Ruis Ramirez-Gonzalez,

Defendant-Appellant.

No. 08-5122

Northern District of Oklahoma

(D.C. No. 07-CR-134-GKF)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **HOLLOWAY** and **McCONNELL**, Circuit Judges.

On August 1, 2006, two officers from the Tulsa Police Department searched

an apartment belonging to Jose Luis Gonzalez-Ramirez (hereinafter Mr.

Gonzalez). The officers claim that Mr. Gonzalez voluntarily consented to the

search and that he spoke "perfect English." Mr. Gonzalez denies that he ever told

the officers that they could either enter or search his home and moved to suppress

---

[*]After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination
of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). This case is
therefore submitted without oral argument. This order and judgment is not
binding precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the evidence uncovered in the search. The district court, at first, sided with Mr. Gonzalez and said that it did "not accept the officer's testimony with respect to the alleged voluntary consent to the warrantless search." The government moved for reconsideration. Apparently changing his mind, the district judge granted the motion, credited the testimony of the officer, and denied Mr. Gonzalez's motion to suppress. Mr. Gonzalez appeals. We affirm the district court's denial of the motion to suppress.

## I. Facts

The two parties in this case give such different versions of the basic facts as to make it nearly impossible to reconcile them. Instead of trying to give a composite version, it seems better instead simply to set the two opposing versions side by side.

### A. Officer Wolthuis's Account

According to one of the officers who searched Mr. Gonzalez's apartment, Officer William Wolthuis, he and his partner, Officer Corbin Collins, went to Mr. Gonzalez's apartment at 3:00 p.m. on August 1, 2006 to "investigat[e] a possible drug trafficker at that location." Doc. 55 at 18. Officer Wolthuis knocked on the door, and Mr. Gonzalez answered. Both officers were dressed in plain clothes, and neither had their guns visible. Officer Wolthuis identified himself and Officer Collins, showed Mr. Gonzalez his badge, and explained to Mr. Gonzalez why he was there: they "had received information that [Mr. Gonzalez] was selling

drugs out of the house." *Id*. at 20. Mr. Gonzalez laughed, and "invited [the] officers in," saying "you can come in and look. I'm not a drug dealer, I don't sell drugs, I'm a landscaper." *Id*. Officer Wolthuis was speaking English, and according to Officer Wolthuis, Mr. Gonzalez spoke "perfect" English. *Id*.

Officer Wolthuis entered the house and sat down with Mr. Gonzalez on the living room couch. He handed Mr. Gonzalez a search waiver and said, "I'll read this to you" and then "[a]fter I finish reading it could you read it, too." *Id*. at 22. He read the waiver aloud to Mr. Gonzalez. Mr. Gonzalez read over Officer Wolthuis's shoulder as the officer was reading the search waiver to him. After reading the waiver to Mr. Gonzalez, Officer Wolthuis said to him: "Do you understand what I just read to you?" *Id*. at 23. Mr. Gonzalez replied that he did. The officer handed the search waiver to Mr. Gonzalez, who "appeared to read it." *Id*. Mr. Gonzalez signed the waiver and wrote the date and the time. (That Mr. Gonzalez signed the statement is one part of the record that is undisputed.)

Officer Wolthuis drew his gun and proceeded to "clear" the hallway, the three bedrooms, and the bathroom, in case somebody was hiding and lying in wait. Mr. Gonzalez and Officer Collins remained in the living room "chatting." *Id*. at 24. Officer Wolthuis then started his search. In the master bedroom closet, he found a gun and a backpack containing a large sum of money. In the garage attached to the house, he found four small bricks of marijuana. He put the evidence in the living room. Mr. Gonzalez said it was not his money, and that it

came from his cousin. Officer Wolthuis told Mr. Gonzalez something along the lines of, if he wanted the money back, he was going to have to fight for it, meaning (according to Officer Wolthuis) that he would have to "go[] to court and get an attorney and fight." *Id*. at 29.

Officer Wolthuis asked Mr. Gonzalez to write out a statement about the money. (This is another part of the record that is undisputed.) The statement read, in full: "The money that the police found is not mine. I was keeping it and the police took it and told me they were going to give it back, and they were going to fight. My cousin Lico Ramirez is living in Arizona." Gonzalez Aff. at ¶ 17. The statement was written in Spanish. By this point, a canine unit had arrived and began searching Mr. Gonzalez's vehicles. Officer Wolthuis told Mr. Gonzalez that they were going to have to take the vehicles; Mr. Gonzalez "was not happy with that." Doc. 55 at 32. But up to that point, Mr. Gonzalez's demeanor was "[p]erfect. He joked around with officers, he spoke perfect English . . . ." *Id*.

**B. Mr. Gonzalez's Account**

Mr. Gonzalez related his version of events in an affidavit submitted (in Spanish) to the district court. According to Mr. Gonzalez, Officer Wolthuis knocked on his door and asked him if he was Jose Gonzalez. As he was answering "yes," another officer emerged from behind Officer Wolthuis. Officer Wolthuis asked Mr. Gonzalez several questions, rapid-fire, about whether he was

selling drugs from his house, and if others were involved in selling drugs from his house. Mr. Gonzalez, because he does "not speak the English language very well," could not understand Officer Wolthuis that well. Gonzalez Aff. at ¶ 4. He had to ask Officer Wolthuis to repeat himself several times. When Mr. Gonzalez "finally understood" what the officer was asking, he denied that he sold drugs from his residence.

Officer Wolthuis then asked Mr. Gonzalez if he could come in and search his house for drugs. Mr. Gonzalez asked the officer if he had a "piece of paper" that said he could come in (meaning a search warrant). Officer Wolthuis shrugged it off, and told him not to worry because he could "get [him] one later." *Id.* at ¶ 5. The officers walked past Mr. Gonzalez into the living room, and Officer Wolthuis reached around his waistband and grabbed his handgun. At that point, Mr. Gonzalez "became scared that they were going to hurt" him if he did not cooperate. *Id.* at ¶ 6. Officer Wolthuis told him to sit down, asked him if anyone else was there, and started shouting "this is the Policia." *Id.* at ¶ 7.

Officer Wolthuis began searching the house, and Officer Collins asked Mr. Gonzalez about the drugs, saying that they were going to find them. Officer Wolthuis came back into the living room and yelled at Mr. Gonzalez, asking him to cooperate and tell him where the drugs were. Mr. Gonzalez was (again) scared that Office Wolthuis was going to hurt him. He told the officer that there was a gun underneath the mattress in his bedroom. Thirty minutes later, another officer

-5-

came to the residence with a dog. Officer Wolthuis said that the dog would find any drugs in the residence.

More officers came. Mr. Gonzalez was questioned about the money Officer Wolthuis had found during his search. Officer Wolthuis also threatened to take away Mr. Gonzalez's vehicles if he did not tell him the name of his "associates." Finally, Officer Wolthuis gave Mr. Gonzalez "a form"—the search waiver—"that another officer gave him" and told him to sign his name on the line. *Id*. at ¶ 14. Mr. Gonzalez said he could not read or write English, and that he could not read the form. *Id*. Officer Wolthuis replied that Mr. Gonzalez would have to sign the form if he ever wanted his money and cars back. He signed it, thinking that the officers would hurt him if he did not sign, and because he wanted the money back.

Officer Wolthuis then gave Mr. Gonzalez another form and told him to write out a statement. Officer Wolthuis told him to write exactly what he said, which was that the money was from his cousin in Arizona, and that he was keeping it for him. Mr. Gonzalez wrote out his statement (which has been quoted above); he says in his affidavit, "I did not write what he [Officer Wolthuis] told me to write because his statement was not true." *Id*. at ¶ 17.

## C. Procedural History

Mr. Gonzalez was prosecuted in state court based on the fruits of the August 1, 2006 search. The 2006 state prosecution went to trial before a jury, at

which Mr. Gonzalez testified. Mr. Gonzalez moved to suppress the fruits of the August 1, 2006 search, but the state court denied his motion. Doc. 56 at 8. The jury convicted Mr. Gonzalez on a misdemeanor offense of simple possession.

Federal charges were also brought against Mr. Gonzalez, one count based on the 2006 search and a second count based on another search conducted in 2007. Mr. Gonzalez duly filed a motion in federal district court to suppress the results of the August 1, 2006 search. Mr. Gonzalez did not take the stand at the federal suppression hearing, instead submitting an affidavit. Officer Collins also did not testify.

The district court, at first, granted Mr. Gonzalez's motion to suppress. In its oral findings, the court said that "[t]he difficulty . . . presented and repeated over and over is highlighted by the language problem." Doc. 50 at 2. The district court was "not convinced under the totality of the circumstances presented to [the court], and particularly taking note of the contemporaneous statement in Spanish [the affidavit] by the defendant here, that defendant's consent was voluntary." *Id*. The court noted in its oral findings that it was "not attacking or making this decision on the basis that Officer Wolthuis' statements . . . are not credible," but rather that given the "imperfect communication" between the officer and Mr. Gonzalez, it could not find that Mr. Gonzalez's consent was voluntary. *Id*.

The district court also issued a written order concluding that the "defendant's consent to the warrantless search of defendant's residence on August

1, 2006, was not voluntary." Dist. Ct. Order at 1. It also said, in a statement seemingly at odds with the oral findings, that "[i]n addition to the statements the Court made on the record, this Court does not accept the officer's testimony with respect to the alleged voluntary consent to the warrantless search." *Id.* Whereas the oral findings were agnostic on the subject of Officer Wolthuis's credibility, the written order flatly said that the court did not "accept" the officer's testimony as to the voluntariness of the search.

The government moved for the district court to reconsider its decision. The motion stated that "[i]f given the opportunity to submit additional evidence to the Court, the United States will clearly establish that defendant's waiver was voluntarily and knowingly given; that the defendant did know enough English to waive his rights and give a consent to search." Mot. at 3. It proffered the testimony of Officer Collins, who accompanied Officer Wolthuis. The proffer said, in part, that Officer Collins spoke to Mr. Gonzalez in English for thirty minutes to an hour and that "[h]e remembers Officer Wolthuis explaining the [search] waiver to" Mr. Gonzalez. *Id.* at 4. The motion emphasized that the "only evidence presented at the suppression hearing is the testimony of Officer Wolthuis and the defendant's statement made at the time of the search and written in Spanish." *Id.* at 6. The government's motion ended by quoting extensively from the state court's ruling denying Mr. Gonzalez's motion to suppress.

Mr. Gonzalez vigorously objected to the government's motion. He said that motions to reconsider should be reserved for "truly extraordinary situations" and that the government offered no new evidence in its motion. Resp. Mot. at 1–2. He noted that Officer Collins did not testify at the suppression hearing, but that he could have, and that the government had access to the state court transcripts. He also argued that Officer Collins's testimony was not as useful as the government made it out to be. Officer Collins had testified that he did not remember whether Officer Wolthuis read the search waiver to Mr. Gonzalez—something Officer Wolthuis testified that he certainly did do. *Id*. at 7. The motion concluded, "Everything that the Government now wants to use to get this Court to reverse itself was available the first time around and the Government chose not to use it—either through negligence or because it didn't help." *Id*. at 11.

The district court granted the government's motion to reconsider, reversing its decision to suppress the fruits of the August 1, 2006 search. The district court said that it had previously given "too much weight" to Mr. Gonzalez's affidavit. Dist. Ct. April 4 Order at 2. It noted that Mr. Gonzalez did not take the stand at the suppression hearing and that his statements in the affidavit were therefore "not subject to cross examination." *Id*. It went on to summarize Officer Wolthuis's testimony: he had testified that Mr. Gonzalez spoke perfect English, that he read the search waiver to Mr. Gonzalez, that Mr. Gonzalez said that he

understood the waiver, that Mr. Gonzalez never said he did not understand English, and that the search waiver was signed and dated by Mr. Gonzalez. *Id.* The district court found that the written statement made by Mr. Gonzalez "merely suggests that the defendant could not write English well." *Id.* "Even if it were to suggest that the defendant cannot read English well," the court continued, "Officer Wolthuis testified under oath that he read the search waiver to [Mr. Gonzalez] and that the defendant spoke English perfectly." *Id.* at 2–3. The district judge went out of his way to insist that in reaching this decision, he did not "rely upon or consider the testimony from other proceedings," such as the state court trial of Mr. Gonzalez, "or proffers of testimony contained in the government's motion to reconsider." *Id.* at 3.

Mr. Gonzalez appeals the denial of the motion to suppress.

## II. Discussion

### A. Standard of Review

When reviewing a denial of a motion to suppress, "we review the court's factual findings for clear error and view the evidence in the light most favorable to the government." *United States v. Worthon*, 520 F.3d 1173, 1178 (10th Cir. 2008). Although the reasonableness of a search is a question of law reviewable de novo, *United States v. Abdenbi*, 361 F.3d 1282, 1287 (10th Cir. 2004), the question of whether consent was voluntarily given is a factual question "to be determined from all the circumstances." *Id.* "We are mindful that at a hearing on

a motion to suppress, the credibility of the witnesses and the weight given to the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1993).

The police testified to facts indicating that Mr. Gonzalez's consent was voluntary, and the district court eventually agreed, crediting the testimony of Officer Wolthuis. "Consent, freely and knowingly given, is one . . . exception to the warrant requirement." *United States v. Gaviria*, 775 F. Supp. 495, 497 (D.R.I. 1991); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Voluntary consent requires "an intellectual understanding of exactly what is being requested and a voluntary acquiescence in light of that understanding." *United States v. D'Allerman*, 712 F.2d 100, 104 (5th Cir. 1983). Where "the government attempts to justify a warrantless search on the basis of consent, the Fourth and Fourteenth Amendments of the Constitution clearly require that the consent be freely given and is not the result of duress or coercion, either express or implied." *United States v. Twomey*, 884 F.2d 46, 50 (1st Cir. 1989).

Mr. Gonzalez says he did not voluntarily consent, and lists several factors which, he says, show that he could not have felt free to terminate his encounter with the officers and go about his business. We face the same problem with all of the factors Mr. Gonzalez lists: Mr. Gonzalez relied on one version of the facts,

while the district court ultimately credited another. We review the district court's factual determinations for clear error. Finding none, we affirm.

**B. Language**

The question of whether Mr. Gonzalez understood what was going on is of foremost importance in this case. Mr. Gonzalez said that he had a hard time understanding Officer Wolthuis and his rapid-fire questioning; he also denied he could read English. More worrisome, there is at least some uncertainty as to whether Officer Wolthuis read "word for word" the contents of the search waiver to Mr. Gonzalez. Doc. 57-2 at 2. The district court's wavering on the issue only serves to highlight its centrality.

Mr. Gonzalez says that the obviously imperfect communication between him and Officer Wolthuis vitiates his consent, and repeatedly cites to and quotes from *United States v. Gaviria*. The facts of that case are distinguishable. Gaviria indicated he did not speak English as soon as the officers started to question him. *Gaviria*, 775 F. Supp. at 496. There was also no consent form signed by Gaviria, something the *Gaviria* court highlighted as a key factor in its decision to find no voluntary consent. *Id.* at 500. By contrast, in this case the district court relied on Officer Wolthuis's testimony that Mr. Gonzalez spoke perfect English, that Mr. Gonzalez said he understood what was read to him (i.e., the consent form), and that Mr. Gonzalez never said that he did not understand English. Dist. Ct. April 4 Order at 2. Although we do acknowledge that the district court seemed to change

its mind about the credibility of Officer Wolthuis, the final order from which this case is an appeal found his testimony made "under oath" to be believable. *Id*. at 3. On the record before us, and "deferring to the district court's evaluation of witness credibility as we must," *United States v. Andrus*, 483 F.3d 711, 721 n.7 (10th Cir. 2007), we cannot say that there was anything clearly erroneous in the district court's crediting of the officer's testimony.

The *Gaviria* court, moreover, distinguished the facts of its case from one that is very close to ours: *United States v. Alvarado*, 898 F.2d 987 (5th Cir. 1990). In that case, the Fifth Circuit said: "in regard to Spanish speaking defendants, where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper." *Id*. at 991. The testimony of Officer Wolthuis seems to demonstrate that Mr. Gonzalez comprehended the situation. The defendant in *Alvarado* also signed a consent form, which was read to him in English. *Id*. at 989. The court held he had consented. In this case, we also have a signed consent form from Mr. Gonzalez. Both of these facts work against Mr. Gonzalez, and show that he could have "fully comprehend[ed] the situation." *Id*. at 991.

If we were in the place of the district court, we might have decided differently. But that is not our charge. Given the deference we owe to the district court, and finding no clear error, we affirm on this point.

-13-

## C.  Other Factors

### 1.  *Right to refuse.*

It is not clear whether Officer Wolthuis told Mr. Gonzalez that he had the option to refuse the search.  Doc. 55 at 59–60, 77.  Officer Wolthuis said he did not consider it necessary to put in his police report that he "told Mr. Gonzalez he had the option not to allow officers to search," because "Mr. Gonzalez had already given consent."  *Id*. at 77.  However, Officer Wolthuis did testify that he read the search waiver form to Mr. Gonzalez, and that Mr. Gonzalez said that he understood what was read to him.  The search waiver says, in its very first sentence, that "[h]aving been informed of my Constitutional right not to have a search made of the premises mentioned without a search warrant being issued, and of my right to refuse to consent to such a search, I hereby authorize" the search.  It is undisputed that Mr. Gonzalez signed the waiver.

The Supreme Court has said that a person's knowledge of his right to refuse a search is "highly relevant" to a determination of consent, but that it is not required to show that consent has been made.  *United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980).  Here, the fact that the right to refuse was part of his signed consent form cuts against Mr. Gonzalez.  Mr. Gonzalez disputes Officer Wolthuis's version of events: he puts the consent form signing *after* the search was already underway, and says that he could not read the form.  But it was not

-14-

clearly erroneous for the district court to credit the officer's testimony that Mr. Gonzalez understood the waiver and signed it before the search was underway.

## 2. *The location of the search.*

Mr. Gonzalez cites a state court case which held that searches in the home have a strong presumption of being non-voluntary. "The home is where a person enjoys the highest expectation of privacy. . . . As such, the factors bearing on the voluntariness of a consent to search must be specially scrutinized." *Kutzorik v. State*, 891 So.2d 645, 648 (Fla. App. 2005). However, we have held that the location of a search has only a "limited relevance" to the question of whether a police-citizen encounter is consensual. *United States v. Little*, 18 F.3d 1499, 1505 (10th Cir. 1994).

Again, this is a factual issue. Officer Wolthuis said Mr. Gonzalez told him to "come in and look," Doc. 55 at 20, and that he signed the consent form after having it read to him. The district court believed the officer's testimony made under oath. We find no clear error.

## 3. *Futility.*

Mr. Gonzalez says that in the face of Officer Wolthuis's gun and "forcible entry already made," he felt he had no choice but to comply. Mr. Gonzalez's version of events also has Officer Wolthuis searching first, and then having Mr. Gonzalez consent later, which he claims shows that it was pointless to resist. *See United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002) ("[A] person might

reasonably think that refusing to consent to a search of his home when he knows that the police have, in fact, already conducted a search of his home, would be a bit like closing the barn door after the horse is out."). Mr. Gonzalez also claims, relatedly, that the "forceful, intrusive nature" of the officers' conduct made his consent less than voluntary. *See United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995) ("'Accusatory, persistent, and intrusive' questioning can turn an otherwise voluntary encounter into a coercive one." (citation omitted)).

Again, the district court seemed to credit Officer Wolthuis's testimony. In Officer Wolthuis's version of the events, Mr. Gonzalez invited the officers in, and freely signed a consent waiver prior to any search. Officer Wolthuis also testified that the rapport between the officers and Mr. Gonzalez was cordial and cooperative. Interpreting the facts in the light most favorable to the government, as we must, *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999), we have no basis for finding the district court conclusion in error.

### 4. *Number of officers.*

Officer Wolthuis's version of events has more officers arriving after the search was finished, and Mr. Gonzalez's version does not directly conflict with this. Mr. Gonzalez has the canine officer coming into his house thirty minutes after the first two officers were there. Another thirty minutes later, he says, "several other police officers" arrived. Gonzalez Aff. at ¶ 11. The search—even

on Mr. Gonzalez's version—seems to have happened before the arrival of the additional officers.

Mr. Gonzalez seems to assert that whenever two officers are present, this is "too many" for a defendant to freely consent to a search. He cites a case with very different facts in support of this proposition, *Harless v. Turner*, 456 F.2d 1337 (10th Cir. 1972), where two officers entered a house at 1:45 a.m., roused the defendant out of bed, and proceeded to question him. We are not about to endorse the claim that, as a matter of law, consent is vitiated any time someone is approached by more than one officer. This would be absurd. Again, on the facts as recounted by Officer Wolthuis, whom the district court believed, we find no clear error.

## IV. Conclusion

Given the deference we owe to the district court, especially on its determination of the credibility of Officer Wolthuis, we AFFIRM the district court's denial of the motion to suppress.

Entered for the Court,

Michael W. McConnell
Circuit Judge