**UNITED STATES of America**

v.

**Carlos A. GAVIRIA.**

**Crim. No. 91–060–P.**

United States District Court,
D. Rhode Island.

Oct. 18, 1991.

Zachariah Chafee, Asst. U.S. Atty., Providence, R.I., for petitioner.

Joseph Bevilacqua, Providence, R.I., for respondent.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

Petitioner Carlos Gaviria filed a Motion to Suppress Physical Evidence seized by Rhode Island State Police Detectives in connection with this case. For the reasons stated below, petitioner's motion is granted.

### I

On June 11, 1991, two plain clothes Rhode Island State Police Detectives, relying on a tip from a confidential informant, waited at the Bonanza Bus Terminal for the arrival of a late afternoon bus from New York City. Specifically, the detectives were looking for a Colombian male in a white shirt, who—according to the informant—would be carrying a kilo of cocaine in a white plastic shopping bag.

No one fitting the informant's description exited the bus which arrived at approximately 3:00 P.M. The detectives left the bus terminal, returning prior to the arrival of the next bus en route from New York. This time, a third detective, Thomas Underhill, accompanied them. At approximately 5:00 P.M., the three detectives witnessed an Hispanic male in a white shirt, carrying a white plastic shopping bag, stepping off the New York bus. The detectives followed this individual, defendant Carlos Gaviria, to the taxi stand outside the terminal. There they approached him, identified themselves as narcotics officers, and attempted to question him. The defendant indicated that he did not speak English, and the language problem central to this motion ensued.

Only one detective, Thomas Underhill, had any familiarity with the Spanish language. Detective Underhill is admittedly not fluent in Spanish. Suppression Hearing Transcript, Sept. 12, 1991, at 9–10. The government and the defendant disagree about the extent of mutual understanding that existed between Detective Underhill and Mr. Gaviria. By all accounts, however, the discussion took place partly in Spanish and partly in English, and at times both Detective Underhill and the defendant had difficulty interpreting what the other was attempting to say.[1]

After asking a series of questions regarding the defendant's point of departure, place of residence, age, and the like, Detective Underhill asked to see the contents of the white plastic shopping bag. The government contends that Mr. Gaviria assented to a search of the bag; the defendant alleges that he did not consent to the search.[2]

The bag was found to contain a quantity of cocaine, at which point Mr. Gaviria was arrested.

### II

Under the Fourth Amendment of the United States Constitution, searches conducted without a warrant are presumptively unreasonable.[3] *United States v. Cruz*

---

1. In the course of the conversation, Detective Underhill took and retained Mr. Gaviria's Alien Registration Card (a.k.a. "Green Card").

2. Specifics as to *how* the bag was searched (i.e., who actually conducted the search, how permission was requested prior to the search) are in dispute. However, even assuming as true the most benign set of underlying facts, the search was invalid. Accordingly, this Court need not delve further into the difference of opinion between the defendant and the government regarding the details of the search. It is worth noting that when disputes of this kind arise, the district court is entitled to "reject[ ] the defendant's version of events and accept[ ] that of the government's witnesses." *United States v. Rodriguez Perez,* 625 F.2d 1021, 1024 (1st Cir.1980).

3. The government has spent a great deal of time researching and briefing the personal seizure aspect of this case. However, personal seizure is not the ground upon which this decision is based. In fact, the Court agrees with the government that no Fourth Amendment violation occurred during the initial stop and attempted questioning of the defendant. Often called a "Terry stop," from the Supreme Court case *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), this aspect of the case does not compel suppression. The totality of the circumstances test includes many factors, only one of which is whether defendant was in custody when consent was given. *Rodriguez Perez, supra.* Mr. Gaviria was not in custody when the detectives questioned him; yet that fact does not automatically make his consent voluntary. The Fourth Amendment violation occurred when

*Jimenez,* 894 F.2d 1, 6 (1st Cir.1990) *(citing Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *overruled on other grounds by Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982)).

However, the evidence acquired by a warrantless search can survive a motion to suppress if the government demonstrates that the search fell within one of several recognized exceptions to the warrant requirement. *United States v. Cruz Jimenez, supra,* at 6 *(citing United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), *overruled on other grounds by Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that a search incident to a valid arrest and conducted pursuant to valid consent is excepted from the warrant requirement)). Probable cause must also exist in conjunction with the recognized exception. *United States v. Cresta,* 825 F.2d 538, 553 (1st Cir.1987), *cert. denied, Impemba v. United States,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988) *(citing Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[w]arrantless searches and seizures are constitutionally impermissible unless supported by probable cause and justified by either exigent circumstances or another recognized exception to the Fourth Amendment warrant requirement")). Consent, freely and knowingly given, is one such recognized exception to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

### III

The general rule prohibiting unreasonable searches and seizures may be waived if the individual in question consents to the search or seizure. *See, Rodriguez Perez, supra,* at 1024 *(citing Schneckloth, supra,* 412 U.S. at 219, 93 S.Ct. at 2043–44). However, where "the government attempts to justify a warrantless search on the basis of consent, the Fourth and Fourteenth

Amendment clearly require that the consent be freely given and is not the result of duress or coercion, either express or implied." *United States v. Twomey,* 884 F.2d 46, 50 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2592, 110 L.Ed.2d 273 (1990). The District Court's determination should be the result of demanding scrutiny of the circumstances. *Id.*

In determining whether or not consent to a search was freely given, the Court must look at the "totality of the circumstances" surrounding the procurement of consent. *See Twomey, supra,* at 51; *United States v. Miller,* 589 F.2d 1117, 1130 (1st Cir. 1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) *(citing Schneckloth, supra,* 412 U.S. at 246–47, 93 S.Ct. at 2057–58).

The government has the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent. *United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974). One element of the state's proof of voluntary consent to a search must be that the consent was an "intentional relinquishment or abandonment of a known right." *Gorman v. United States,* 380 F.2d 158, 163 (1st Cir.1967) *(quoting Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1937)); *Leavitt v. Howard,* 332 F.Supp. 845, 853 (D.R.I.1971), *rev'd on other grounds,* 462 F.2d 992 (1st Cir.1972), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). However, it is not necessary for the police to inform the subject of the search of his right to refuse. *Schneckloth, supra,* 412 U.S. at 231–32, 93 S.Ct. at 2049–50. "Rather, it is only by analyzing all the circumstances that it can be ascertained whether in fact [the search] was voluntary or coerced. It is this careful sifting of the unique facts of each case that is evidenced in our prior decisions involving consent searches." *Id.*

The "totality of the circumstances" test for determining voluntary consent necessi-

the Rhode Island police searched the defendant's bag without a warrant and without his

free and knowing consent.

tates a highly individualized, fact specific inquiry. In the present case, the most serious challenge to the government's assertion of voluntary consent stems from the fact that the defendant does not speak English. At this juncture, it will be helpful to examine the particular instances in which other federal courts have applied the "totality of the circumstances" test to cases involving potential language barriers.

## IV

In *United States v. Alvarado*, 898 F.2d 987 (5th Cir.1990), a Spanish-speaking defendant moved to suppress evidence found during an alleged consent search of his car. He claimed his consent was not voluntary because of his limited ability to communicate in English. The Fifth Circuit concluded that "in regard to Spanish speaking defendants, where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper." *Id.* at 991. However, it must be noted that the defendant in *Alvarado* signed a written consent form which had been read to him in English.[4] *Id.* at 989. The presence of a signed, written consent form serves to significantly bolster the claim of voluntariness of consent, and provides an additional means of assurance that the non-native speaker understands what his consent means. No such consent form was given to Mr. Gaviria before his bag was searched.

The Eighth Circuit was recently faced with a drug possession case in which a Spanish-speaking defendant argued that he had not voluntarily consented to a search of his van. *United States v. Cortez*, 935 F.2d 135 (8th Cir.1991). The defendant orally consented to the search and signed a consent form written in English AND in Spanish. The fact that the consent form was written in Spanish as well as in English effectively negated any inference that the defendant did not voluntarily consent to the search of his vehicle. The use of a consent form clearly distinguishes *Cortez* from the instant case.

The Second Circuit had an even more clear-cut set of facts on which to rest its finding of voluntary consent in *United States v. Zapata–Tamallo*, 833 F.2d 25 (2d Cir.1987). The defendant in *Zapata–Tamallo* claimed that her consent to a search of her apartment was not voluntary. However, the Drug Enforcement Agent who secured her consent had given her a Spanish-language consent form, which she signed; additionally, he had orally explained her rights to her IN SPANISH. The instant case is thus distinguishable from *Zapata–Tamallo* not only because of the absence of a Spanish consent form, but also because Detective Underhill simply asked Gaviria if he (Underhill) could look in Gaviria's bag. No one explained Gaviria's rights to him in even the most cursory manner, in Spanish OR in English. Suppression Hearing Transcript, Sept. 12, 1991, at 20.[5]

An equally clear-cut case was *United States v. Velasquez*, 885 F.2d 1076 (3rd

---

4. Even this may not be enough. In *United States v. Suarez*, 694 F.Supp. 926, 939 (S.D.Ga. 1988), *aff'd*, 885 F.2d 1574 (11th Cir.1989), the district court held that the government could not rely on a *signed* English-language consent form where the subject of the search spoke mainly Spanish. The subject's English-speaking wife had translated the consent form; however, the court found the translation inadequate.

5. The same reasoning was used by the District Court for the Eastern District of New York in a case similar to *Zapata–Tamallo*. *See United States v. Galindo-Hernandez*, 674 F.Supp. 979 (E.D.N.Y.1987). As in *Zapata–Tamallo*, the Court's inquiry in *Galindo–Hernandez* con-

cerned the voluntariness of a consent to search given by a Spanish-speaking defendant. The Court reasoned as follows:

> Galindo signed a consent to search form, after first being read his rights in Spanish. This waiver, which we find to be knowing and voluntary, explicitly permitted the agents to search the handbag. Galindo cannot now object to the government's use of the fruits of that search, and his motion to suppress the items obtained thereby is accordingly denied.

Id. at 985. As stated above, the present case involved neither a consent form nor a recitation of the defendant's rights in Spanish; therefore, *Galindo–Hernandez* is easily distinguished.

Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990). Police officers originally stopped the defendant for speeding. When they asked for her consent to search the car, she replied, "Yes, you can search." *Id.* at 1082. The conversation proceeded in English with no language problems. Additionally, the defendant was forty-three years old and college educated. She had lived and worked in the United States for at least fifteen years; the district court specifically found that she could speak and understand English.

However, because the police officer detected the defendant's Spanish accent, the officer provided her with a consent form written in Spanish. The officer explained the form and asked her to read it. After appearing to have read it, the defendant signed the consent form. *Id.* In contrast to *Gaviria*, the police officers in *Velasquez* went to great lengths to ensure defendant's consent was voluntary.

In *United States v. Moreno*, 742 F.2d 532 (9th Cir.1984), the defendant was also a Colombian citizen. The Ninth Circuit found that the defendant's lack of familiarity with police procedures in this country, his alienage, and his limited ability to speak and understand the English language contributed significantly to the degree of coercion present at a Drug Enforcement Agency office. Even the concurrence, which accuses the majority of engaging in a subjective reasonableness test, admits that an obvious language barrier should be considered when evaluating consent. *Id.* at 537–38 (J. Wallace, concurring).

While the *Moreno* case concerned the unlawful seizure of the defendant, an analogy to our present case can be drawn. The Ninth Circuit speaks of the voluntariness of the defendant accompanying the police; here we analyze the voluntariness of the consent to search. According to *Moreno*, the language barrier between Gaviria and Underhill is a important factor for this Court to consider in determining voluntariness of consent.

In *United States v. Castrillon*, 716 F.2d 1279 (9th Cir.1983), the Court of Appeals remanded a case concerning voluntary consent and a language barrier back to the district court for specific factual determinations. The factual questions all centered on defendant Castrillion's comprehension of the Spanish spoken to him by detectives and the Spanish language consent form he signed. (Castrillion later claimed to be virtually illiterate in any language.) *Id.* at 1283–84. The Ninth Circuit's remand indicates that language comprehension must be carefully scrutinized in voluntary consent cases.

This Court finds considerable authority for its conclusion that Mr. Gaviria's consent was not voluntary in *United States v. Gallego–Zapata*, 630 F.Supp. 665 (D.Mass. 1986). In *Gallego–Zapata*, a Colombian male whose ability to speak and understand English was described as "extremely limited" moved to suppress evidence uncovered during an allegedly consensual search. *Id.* at 666. Prior to the search, Gallego–Zapata was questioned by agents who resorted to speaking a mixture of English and Spanish, and he followed suit, responding to some questions in English and to others in Spanish. This intermingled use of two languages also characterized the discussion between Mr. Gaviria and Detective Underhill prior to the search of Gaviria's bag.

The Court in *Gallego–Zapata* held that the defendant had not voluntarily consented to a search of his bag and jacket, and it therefore granted his motion to suppress the evidence procured by that search. Among the factors cited by the Court as persuasive were the defendant's age (twenty-two years old), his education (seven years of schooling in Colombia), his ability to speak and understand English (extremely limited), and the fact that "[h]e had only recently arrived in the United States and so probably lacked familiarity with his rights under the United States Constitution, including his right to insist that the officers obtain a search warrant." *Id.* at 675. Furthermore, the Court noted that:

the agents and Gallego–Zapata were having difficulty communicating because of Gallego–Zapata's limited skills in English, and the agents resorted to a combi-

nation of short English sentences and sign language to convey to him that they wanted to search his jacket. The agents never told him that he could refuse to allow them to search.

*Id.* [6]

The factual similarities between *Gallego–Zapata* and the instant case are striking. Mr. Gaviria is a twenty-one year old Colombian native with limited formal education, none of which was received in American schools. He speaks little English. Suppression Hearing Transcript, Sept. 16, 1991, at 40–42. Finally, this Court is far from confident that Mr. Gaviria understood what Detective Underhill was saying to him when the Detective asked to see what was inside his bag. As the Translation Hearing of Oct. 2, 1991 indicated, much of what the Detective was trying to say would make little or no sense to a person whose native tongue was Spanish. *See* Translation Hearing Transcript of Oct. 2, 1991. This Court finds the facts of this case clearly aligned with those of *Gallego–Zapata*.

## V

In light of the cases discussed above, we now turn to a thorough analysis of the facts in this case. One striking dissimilarity between the above cases and the case at bar is the presence of a signed consent form in the former, and its absence in the latter. While the existence of a signed consent form is not, without more, always sufficient proof of voluntary consent, it *is* strong evidence that consent was freely and knowingly given. Similarly, the absence of a consent form does not automatically vitiate voluntary consent.

It seems clear, however, that utilization of consent forms significantly reduces the possibility of dispute over the voluntariness of consent. A Spanish-language consent form, read and signed by Mr. Gaviria, would have offered strong evidence of his voluntary consent. In the absence of such a signed consent form, the Court's inquiry must proceed further.

The haziest issue in this case is the degree of understanding between the defendant and Detective Underhill on June 11, 1991. Detective Underhill testified that he believed the defendant understood what he was saying. Suppression Hearing Transcript, Sept. 12, 1991, at 39–41. Mr. Gaviria contends that he understood little of the conversation and picked up most clues through the detective's hand gestures. Suppression Hearing Transcript, Sept. 16, 1991, at 55.

Because this linguistic dispute is central to the larger issue of suppression, this Court held yet another hearing on October 2, 1991. At the Court's request, Ana–Cecilia Rosado, a court-certified interpreter, translated from Spanish to English the statements made by Detective Underhill at the first two hearings on this motion. It became clear during the course of the October 2 hearing that Detective Underhill's Spanish was far from perfect.[7] As a result, the Court now has little doubt that there was a significant amount of miscommunication between Gaviria and Underhill.[8]

---

**6.** *But see United States v. Garcia–Restrepo,* 648 F.Supp. 1188 (S.D.Fla.1986). In *Garcia–Restrepo,* the Court stated that "no evidence was presented at the suppression hearings to indicate that the Defendant Garcia–Restrepo understood the phrase, 'con permiso' in any way other than a request by [the agent] for her consent to inspect her bag." *Id.* at 1190. In the instant case, defendant Gaviria contested the meaning of what the Detective said, and the court-certified interpreter later testified that any native Spanish speaker would have found it difficult or impossible to understand much of the Detective's Spanish. *See* Translation Hearing Transcript, Oct. 2, 1991. The Court's reasoning in *Garcia–Restrepo* is not applicable to our factual situation.

**7.** *See* Translation Hearing Transcript, Oct. 2, 1991.

**8.** The Court acknowledges the fact that Detective Underhill's Spanish on Sept. 12, 1991 was probably greatly improved from that which he spoke the day of Mr. Gaviria's arrest. After the June 11, 1991 arrest, Detective Underhill continued attending Spanish classes. It is impossible for this Court to measure Detective Underhill's Spanish language proficiency in June as compared with that of September. We can only reason backwards and assume that his Spanish today is better than it was before. The limited proficiency in Spanish exhibited by Detective Underhill at the Suppression Hearing casts further doubt on Mr. Gaviria's ability to compre-

Detective Underhill began the questioning of Mr. Gaviria by stating in Spanish, "I love myself Detective Thomas Underhill." Translation Hearing Transcript, Oct. 2, 1991, at 8. Later, Detective Underhill said, "I speak more slowly," when he meant to ask Mr. Gaviria to speak slower. *Id.* at 12–13. The Court questioned the translator, Ms. Ana–Cecilia Rosado, about the comprehensibility of that phrase.

> The Court: "If I said that to a Spanish person, would they probably know what I meant?"
> Ms. Rosado: "I doubt it."

*Id.* at 12. When attempting to say "wallet" in Spanish, Detective Underhill used a word that is meaningless in Spanish. *Id.* at 19.

During the encounter, Detective Underhill asked Mr. Gaviria, "How do I love my friends?" Not surprisingly, Mr. Gaviria answered, "I don't know" in Spanish. *Id.* at 21. In trying to ask Mr. Gaviria whether he lived alone, Detective Underhill said "I live only?" *Id.* at 20. At the time of Mr. Gaviria's arrest, while attempting to give an intelligible form of Miranda warning, Detective Underhill said "I don't say anything" when he wanted to advise the defendant to be silent. *Id.* at 25.

Notably, under Detective Underhill's version of events, his conversation with the defendant began in a confrontational manner. Detective Underhill first told Mr. Gaviria "excuse me, answer," using the imperative tense. Translation Hearing Transcript, Oct. 2, 1991, at 9. Later, the detective said, "show me an identification," again using the imperative. *Id.* at 17. De-

tective Underhill sought permission to search Gaviria's bag only after issuing at least two commands; it is easy to imagine that Mr. Gaviria interpreted this request as simply another order. Mr. Gaviria's version of events presents a more chaotic picture, but even according to Detective Underhill's recollection of the events of June 11, confusion reigned.[9]

While some of the language mistakes are humorous, it is also clear that Detective Underhill did not grasp the proper use of tenses. Some of his commands to Mr. Gaviria were in the first person, instead of the second person. Other "requests" were actually commands using the imperative tense. In addition to his frequent grammatical mistakes, Detective Underhill's pronunciation was poor. Very few of us are in a position to adequately understand how important subtle differences in pronunciation are. Ms. Rosado, a court-certified translator and Spanish teacher, testified that diphthongs and vowels are crucial in Spanish.[10]

When viewed individually, Mr. Gaviria's responses to some of the questions posed by Detective Underhill show that a limited amount of communication did occur. Other segments of the conversation, as reported by Detective Underhill, clearly could not have made sense to the defendant, since a portion of what the Detective said was literally meaningless in Spanish. Looking at the conversation as a whole, this Court does not feel comfortable second guessing what was, and what was not, comprehensible. It is unreasonable to assume that Mr. Gaviria voluntarily consented to the search,

---

hend his Spanish the day of the search and arrest.

**9.** In its brief on this motion, the government insists that the only way defendant's version of events can be believed is if the Court finds the testimony of the detectives to be largely perjurious. This argument incorrectly assumes that the Court could only grant the motion to suppress if it believes defendant's version of what transpired on June 11. Quite to the contrary, this Court has, in fact, adopted Detective Underhill's version of events in analyzing the defendant's grounds for suppression. It remains true, however, that Detective Underhill and Mr. Gaviria had serious communication problems.

The government has simply not met its burden of proving, *by a preponderance of the evidence*, that Mr. Gaviria's consent was voluntary. The Court has reached this conclusion without doubting in the slightest the veracity of Detective Underhill's testimony.

**10.** For the aid of those who have forgotten their early years of education, the Random House College Dictionary defines a diphthong as "an unsegmented, gliding sound varying continuously in phonetic quality but held as a single sound." The *io* sound in *motion* is a diphthong, as compared with a separate pronunciation of each vowel as in *ion*.

simply because he eventually bent down and removed items from the bag.

The totality of the circumstances test requires this Court to examine not only the defendant's ability to comprehend Detective Underhill's Spanish, but a confluence of other factors as well. Mr. Gaviria's age, his limited education, the presence of three detectives at his questioning, and Detective Underhill's retention of his Green Card throughout the encounter must all be considered. In this Court's opinion, each of these factors lends credence to the defendant's claim that his consent was not voluntary.

The suppression of evidence under the exclusionary rule is intended, in part, to deter police conduct violative of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). By their own testimony, Rhode Island Narcotics officers occasionally go to the bus station to question people fitting drug courier profiles. Suppression Hearing Transcript, Sept. 12, 1991, at 58–59; Suppression Hearing Transcript, Sept. 16, 1991, at 6–9 (testimony of Detective Robert E. Mackisey). Often the people stopped are Hispanic. Not a single individual on the Rhode Island police force is fluent in Spanish; Detective Underhill did the best he could with limited language study.

The Court wonders what would have transpired if Mr. Gaviria had arrived on the earlier bus on June 11. Without the benefit of even Detective Underhill's limited Spanish, the detectives would have encountered insurmountable language problems with Mr. Gaviria. The Court is deeply concerned that the Rhode Island police have no institutional procedure for dealing with cases of this nature. With an ever-increasing Hispanic population in our area, police will certainly be faced in the future with other suspects who speak little or no English.

Hispanic suspects who neither speak English nor are familiar with their rights under the Constitution are doubly disadvantaged in their encounters with law enforcement personnel. Fourth Amendment protections are particularly important in such cases and may not be abrogated by a language barrier. Some mechanism, whether it be the use of written Spanish consent forms, training of police officers in a second language, or some other creative device, must be adopted to ensure that police do not abridge the constitutional rights of these individuals simply because they do not speak English.

### VI

It is not for this Court to decide on proper police procedure. However, the Court can—and does—insist that each defendant be equally treated regardless of his or her native tongue. The record in this case reflects too much confusion and too little comprehension for the defendant's consent to have been voluntarily given. Absent voluntary consent, the search was invalid, and the Motion to Suppress must be granted.

SO ORDERED.