Anibal Montanez v. State
















IN THE
TENTH COURT OF APPEALS
 

No. 10-02-00274-CR

Â Â Â Â Â ANIBAL MONTANEZ 
Â Â Â Â Â A/K/A IVAN MONTILLA-PENA,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â v.

Â Â Â Â Â THE STATE OF TEXAS,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 

From the 217th District Court
Angelina County, Texas
Trial Court # 21844
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

O P I N I O N
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â This is a suppression case.
Â Â Â Â Â Â Appellant, a native of Puerto Rico, does not speak English well. He âconsentedâ to a
search of the vehicle he was driving. The definitive issue before us is whether the trial judge,
in denying a motion to suppress the evidence, could have found by clear and convincing
evidence that Appellant freely and voluntarily consented to the search. We conclude that the
answer is âno.â
Â Â Â Â Â Â Appellant and an unrelated passenger, a native of the Dominican Republic who speaks less
English than Appellant, both non-residents of Texas, were traveling in a borrowed car when 
Investigator Jason Bridges of the Deep East Texas Regional Narcotics Task Force stopped the
vehicle to investigate possible traffic violations. Events led to discovery of a âtrapdoorâ in the
gasoline tank where seven kilos of cocaine were stored. After the trial court denied a motion
to suppress the evidence, Appellant pled guilty and was sentenced to twenty years in prison. 
In a single issue, he complains of the denial of his pre-trial motion, challenging the ruling on
three levels: (1) the stop was not justified; (2) consent was not proven by clear and convincing
evidence; and (3) the scope of the search went beyond the consent. The State, asserting
jurisdictional and procedural objections, does not address the merits of Appellantâs issue.



Â Â Â Â Â Â We have reviewed the record of the suppression hearing held on April 15, 2002, including 
the videotape admitted into evidence that covers the time period from the stop until Appellantâs
arrest. We will follow the general rule that âappellate courts should afford almost total
deference to a trial court's determination of the historical facts that the record supports
especially when the trial court's fact findings are based on an evaluation of credibility and
demeanor.â Brown v. State, 115 S.W.3d 633, 635 (Tex. App.âWaco 2003, no pet.) (citing
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)).
Â 

THE TRAFFIC STOP
Â Â Â Â Â Â With respect to the officerâs right to stop Appellant, we have noted, âWhen a traffic
violation is committed within an officer's view, the officer may lawfully stop and detain a
person for the traffic violation.â Bellard v. State, 101 S.W.3d 594, 600 (Tex. App.âWaco
2003, pet. refâd). Investigator Bridges testified that Appellant was stopped because the officer
observed that the license plate light was not working and because a frame around the license
plate was obscuring part of the plate. We will assume without deciding that the stop was
justified and turn directly to the question of the validity of Appellantâs consent.
CONSENT TO SEARCH
Â Â Â Â Â Â Appellant asserts the protections of article I, section 9 of the Texas Constitution. Tex. 
Const. art. I, Â§ 9. A search after voluntary consent is not unreasonable under that provision. 
See Reasor v. State, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). However, voluntary
consent is not shown by a mere acquiescence to a claim of lawful authority. Carmouche v. 
State, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). Whether consent was given voluntarily is
a question of fact to be determined from the totality of the circumstances. Reasor, 12 S.W.3d
at 818. â[T]he State has the burden of proof by clear and convincing evidence that consent
was freely and voluntarily given.â Lopes v. State, 85 S.W.3d 844, 848 (Tex. App.âWaco
2002, no pet.) (citing State v. Ibarra, 953 S.W.2d 242, 245 (Tex. Crim. App. 1997); and
Meeks v. State, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985)).
Â Â Â Â Â Â At the hearing on the motion to suppress, Investigator Bridges testified that he was an
eight-year veteran peace officer who had had over 1,500 hours of in-service training in various
schoolsâincluding interdiction schools and narcotics schools and including 500-600 hours in
concealment methods. He said that Appellant âdid not speak very much English, so we did
have somewhat of a language barrier.â He said he asked for and received consent to search
the vehicle.


 A videotape taken at the scene of the traffic stop was admitted into evidence
without objection.



Â Â Â Â Â Â On cross-examination, Bridges maintained that they had âcommunicated quite wellâ but
acknowledged that Appellant âspoke very littleâ English.
Â Â Â Â Â Â As the trial court noted, the videotape speaks for itself. Our review of the videotape
shows that Investigator Bridges had great difficulty in communicating with both Appellant and
his passenger. It is readily apparent from the videotape that Appellant spoke little English and
his passenger less. Investigator Bridges spoke some words in Spanish, rather unsuccessfully. 
In fact, Bridges asked two other officers who appeared during the one-hour-plus search
whether they spoke Spanish, implying that he questioned whether he had effectively
communicated with Appellant and his passenger.
Â Â Â Â Â Â Giving almost total deference to the trial courtâs findings and applying a legal sufficiency
standard of review,


 we nevertheless conclude from a review of the record of the suppression
hearing that the trial court could not have found by clear and convincing evidence that
Appellant freely and voluntarily consented to the search. Id. As the Court of Criminal Appeals
noted in Ibarra: âIndeed, free and voluntary consent may come with more difficulty to those
who, like many Texas immigrants, have a limited understanding of the English language.â 
Ibarra, 953 S.W.2d at 245. To paraphrase the Court in a more recent case: Appellant, âwho
was clearly unaccustomed to asserting âpersonal rightsâ against the authority of [law
enforcement], may well not have had the slightest notion that he had any ârightsâ or any
âprivilegeâ to assert them.â See Garcia v. State, ___ S.W.3d ____, 2004 WL 574554 *8 (Tex.
Crim. App. March 24, 2004).
Â Â Â Â Â Â Investigator Bridges had had over 1,500 hours of training in narcotics interdiction. He
undoubtedly came into contact on a daily basis with individuals who had little command of the
English language. We find instructive the observations of the United States District Court for
the District of Rhode Island in a case in which the court suppressed, because of an absence of
voluntary consent,


 evidence of a search of a bag carried by the defendant, who had âlimited
skills in Englishâ:
The Court is deeply concerned that the Rhode Island police have no institutional procedure
for dealing with cases of this nature. With an ever-increasing Hispanic population in our
area, police will certainly be faced in the future with other suspects who speak little or no
English.
Â 
Hispanic suspects who neither speak English nor are familiar with their rights under the
Constitution are doubly disadvantaged in their encounters with law enforcement personnel. 
Fourth Amendment protections are particularly important in such cases and may not be
abrogated by a language barrier. Some mechanism, whether it be the use of written
Spanish consent forms, training of police officers in a second language, or some other
creative device, must be adopted to ensure that police do not abridge the constitutional
rights of those individuals simply because they do not speak English.
Â 
United States v. Gaviria, 775 F. Supp. 495, 502 (D. R. I. 1991).
Â Â Â Â Â Â In Estrada v. State, the Austin Court upheld a search, observing that Estrada spoke âin
heavily accented but clear Englishâ and âunderstood what [the officer] was asking . . . . 
[A]ppellantâs affirmative response was prompt and seemingly unforced.â Estrada v. State, 30
S.W.3d 599, 604 (Tex. App.âAustin 2000, pet. refâd).


 We find Estrada distinguishable,
based on the difference between the courtâs description of Estradaâs ability to speak and
understand English and Appellantâs ability to speak and understand English as shown by the
videotape in this case.
SCOPE OF THE SEARCH
Â Â Â Â Â Â We do not reach Appellantâs third ground of attack that the scope of the search in this
instance exceeded the consent given. See Mantzke v. State, 93 S.W.3d 536, 540 (Tex.
App.âTexarkana 2002, no pet.) (extent of a search is limited to the scope of the consent given,
and the scope of the consent is generally defined by its expressed object; standard for measuring
the scope of consent is that of objective reasonableness, i.e., what a reasonable person would
have understood by the exchange between the officer and the individual).
CONCLUSION
Â Â Â Â Â Â Having determined that Appellantâs consent to search was not proven by clear and
convincing evidence, we sustain Appellantâs issue, reverse the judgment, grant Appellantâs
motion to suppress all evidence seized as a result of the search, and remand the cause to the trial
court for further proceedings consistent with this opinion.
Â 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â BILL VANCE
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Â 
Before Chief Justice Gray,
Â Â Â Â Â Â Justice Vance, and
Â Â Â Â Â Â Justice Reyna
Â Â Â Â Â Â (Chief Justice Gray dissenting)
Reversed, motion granted, remanded with instructions
Opinion delivered and filed May 12, 2004
Publish
[CR25]



5in;line-height:200%'>McCord paid its pro rata share of the acquisition
costs for the Perez ranch and the Sue-Ann lease.  In August 1998, McCord determined that the
Perez ranch lay within the AMI and notified OÂSullivan that it had elected to
not participate in the ownership of the surface and mineral estates which had
been acquired.Â  OÂSullivan advised that
it was about to sell these interests and suggested that McCord accept its pro
rata share from the proceeds of the sales as reimbursement.Â  McCord agreed to this arrangement.

OÂSullivan assigned a portion of the Sue-Ann
lease that same month to Pursuit Exploration Company, another party to the
purchase and participation agreement and the operating agreement.Â  OÂSullivan assigned to Pursuit the oil and
gas leasehold interest Âlying below the subsurface depth of 9,765 [feet].Â OÂ
Sullivan sold the surface estate in November.Â 
OÂSullivan reimbursed McCord for 25% of the proceeds from these
conveyances.

Because Pursuit Exploration was a party to the
purchase and participation agreement and the operating agreement, it notified
the other parties of its acquisition of that portion of the Sue-Ann leasehold
lying beneath 9,765 feet.Â  McCord elected
to participate in the lease.Â  San Saba
declined.

Â 

Procedural Background

San Saba alleges in its eighth amended petition that
McCord breached the partiesÂ agreements by failing to offer a proportional share
of the interests and/or rights of acquisition which McCord acquired in the
surface and mineral estates of the 605-acre tract.Â  San Saba alleges that McCord engaged in Âan
elaborate shamÂ with Pursuit Exploration, OÂSullivan, and Scully to defraud San
Saba out of the mineral interests it would have otherwise been entitled to
under the agreements.

McCord filed a motion for summary judgment
alleging: (A) Âengaging in a plan or scheme to breach a contract is not a valid
cause of actionÂ; (B) under the terms of the joint operating agreement, there
was no breach because (1) McCord never acquired title to any interest in the
605-acre tract, (2) McCord never acquired any ÂfarminÂ
rights in the 605-acre tract, and (3) the purchase and participation agreement
did not change McCordÂs obligations with respect to additional mineral
interests acquired in the AMI; and (C) there is no evidence that San Saba
suffered damages as a result of McCordÂs conduct.

In response, San Saba contended: (A) the terms
of the purchase and participation agreement control over the terms of the
operating agreement with respect to additional mineral interests acquired in
the AMI; (B) a genuine issue of material fact remains on the question of
whether McCord acquired an interest which he had an obligation to offer to the
other parties under the terms of the agreements; (C) a genuine issue of
material fact remains on the question of whether McCord conspired with others
to defraud San Saba; and (D) a genuine issue of material fact remains on the amount
of profits San Saba lost as a result of McCordÂs conduct.

Breach of Contract Claim

San Saba contends in its first and second issues
that a genuine issue of material fact remains on the question of whether McCord
acquired (or acquired the right to acquire) an oil and gas interest in which
the partiesÂ contracts required McCord to offer San Saba a proportional share.Â  McCord responds that no fact issue exists
because the agreements required it to offer a proportional share of additional
interests to the other parties only if it acquired actual title to such
additional interests or if it acquired a farm-in interest.

To resolve these issues, we must first determine
what obligations the partiesÂ agreements imposed in connection with the
acquisition of additional mineral interests.Â 
The purchase and participation agreement defines additional mineral
interests in pertinent part as Âany additional oil, gas or mineral interest or
right to acquire such interest covering any portion of the AMI.ÂÂ  Conversely, the operating agreement defines
the requisite additional interests as Âa lease interest, royalty, overriding
royalty, or mineral right affecting any lands within the AMI or acquire the
right to acquire any such interest (i.e.,
by farmin).ÂÂ  

Because the operating agreement uses the
descriptive term Âi.e., by farminÂ to modify
the phrase regarding the acquisition of Âthe right to acquireÂ an additional
mineral interest in the AMI, it contains a more restrictive definition of the
requisite additional interests than does the purchase and participation
agreement.Â  See U.S. v. King, 849 F.2d 1259, 1260 (9th Cir. 1988)[5]
(quoting H. W. Fowler, A Dictionary of
Modern English Usage 263 (Sir Ernest Gowers, rev.
ed., Oxford U. Press 1983)) (other citations omitted); see also Intel Corp. v. Broadcom Corp.,
172 F. Supp. 2d 478, 495 (D. Del. 2001) (mem.); Redd v. Ingram, 207 Va. 939, 154 S.E.2d 149, 151 (1967).

Â[A]greements executed
at the same time, with the same purpose, and as part of the same transaction,
are construed together.ÂÂ  In re Prudential Ins. Co. of Am., 148
S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).

Here, both agreements provide that the terms of
the purchase and participation agreement control in cases of conflict.Â  Therefore, the definition of additional mineral
interests contained in the purchase and participation agreement controls.

If a party to the agreements acquired such an
interest, the operating agreement imposes an obligation on such party to
Âimmediately give written notice thereof to the other parties, together with
all pertinent details and information.ÂÂ 
The operating agreement further provides each of the other parties shall
have twenty days after receiving notice to make a written election to Âacquire
its proportionate interest . . . for payment of a like proportion of the
acquisition costs.Â

The OÂSullivan program agreement provides in
pertinent part that Âeach party electing to participate and participating in
[an] acquisition shall . . . be deemed the
owner of the undivided interest therein that he or it is entitled to take
or has elected to take, as the case may be.ÂÂ 
(emphasis added).Â  The summary judgment record reflects that
McCord initially elected to participate in the purchase of the Perez ranch and
in the acquisition of the Sue-Ann lease.Â 
McCord provided its proportional share of the purchase money for these
acquisitions.Â  

McCord retained its interest in the Sue-Ann
lease for approximately three months and its interest in the Perez ranch for
approximately five months.

According to the affidavit of Christopher
Scully, offered in support of McCordÂs summary judgment motion, when the Perez
ranch and the Sue-Ann lease were acquired, 

a percentage of the acquisitions were assigned to McCord.Â  When McCord elected not to participate in
[these] acquisitions, the McCord
interests were reassigned to the other participants in the
OÂSullivan/McCord Joint Venture . . . .Â 
Once [these] interests were reassigned to the other OÂSullivan/McCord
Joint Venture participants, McCord no
longer held an interest in either [of them].

Â 

(emphases added).

Â Â Â Â Â Â Â Â Â  Accordingly,
a genuine issue of material fact remains on the question of whether McCord
acquired an Âadditional oil, gas or mineral interestÂ within the AMI.Â  Because a fact issue exists on the question
of whether McCord acquired an Âadditional oil, gas or mineral interestÂ within
the AMI and because it is undisputed that McCord failed to give notice of this
additional interest to San Saba, we sustain San SabaÂs
first and second issues.

Fraud
Claim

San Saba contends in its third issue that a
genuine issue of material fact remains on the question of whether McCord
participated in a plan and scheme to defraud San Saba out of this proportional
interest.Â  McCord characterizes San SabaÂs claim as an allegation that McCord conspired with
others to breach the partiesÂ agreements, which McCord contends is not an
actionable claim.

ÂGenerally, a movant must specially except
before urging a motion for summary judgment that alleges a failure to state a
claim, thereby giving the plaintiff an opportunity to amend deficient
pleadings.ÂÂ  Toles v. Toles, 113 S.W.3d 899, 909 (Tex.
App.ÂDallas 2003, no pet.); accord Friesenhahn v. Ryan, 960 S.W.2d 656, 658 (Tex. 1998); Salmon
v. Miller, 958 S.W.2d 424, 429 (Tex. App.ÂTexarkana 1997, pet.
denied).Â  Here, McCord did specially
except, and the trial court sustained McCordÂs special exceptions.Â  San Saba filed its eighth amended petition
after this ruling.

We agree with McCord that in Texas a party to a contract may not sue another party
to the contract for conspiracy to breach the contract.Â  See Grizzle
v. Tex. Commerce Bank, N.A., 38 S.W.3d 265, 284-85 (Tex. App.ÂDallas 2001),
revÂd in part on other grounds, 96 S.W.3d 240
(Tex. 2002); Deaton
v. United Mobile
Networks, L.P.,926 S.W.2d 756,
760-61 (Tex. App.ÂTexarkana 1996), revÂd on other grounds,
939 S.W.2d 146 (Tex. 1997); see also Morgan
Stanley & Co. v. Tex. Oil Co., 958 S.W.2d 178, 179 (Tex. 1997) (Âa
person must be a stranger to a contract to tortiously
interfere with itÂ); accord Prudential
Ins. Co. of Am. v. Fin. Rev. Servs., Inc., 29
S.W.3d 74, 78-79 (Tex. 2000); Grizzle,
38 S.W.3d at 286. 

Here, San Saba alleges that McCord engaged in
fraudulent transactions with others Âto prevent Plaintiffs from realizing the
full interest in the 605 acre lease and minerals to which they were entitled to
[sic] under the [operating agreement].ÂÂ 
This is nothing more than an allegation that McCord conspired with
others to breach the operating agreement.Â 
Such a cause of action is not recognized in Texas.Â  Id.

Accordingly, we overrule San SabaÂs
third issue.

Damages

San Saba contends in its fourth issue that a
genuine issue of material fact remains on the question of whether it suffered
damages as a result of McCordÂs conduct.Â 
McCord responds that: (1) any damages San Saba suffered were caused not
by McCordÂs failure to offer the additional AMI interest to San Saba but by San
SabaÂs failure to take advantage of a later offer by
Pursuit Exploration to participate in the same interest; (2) San SabaÂs summary judgment response is deficient because it
fails to identify any particular summary judgment evidence to prove causation;
and (3) San Saba offered no evidence regarding the proper measure of damages.

In response to the summary judgment motion, San
Saba offered several exhibits, including: (1) excerpts from McCordÂs deposition
and supporting documents; and (2) the 15-page affidavit of Jonathan Preston,
San SabaÂs managing general partner.

In the traditional portion of McCordÂs summary
judgment motion, McCord contends that any damages suffered by San Saba were
caused by its own decision to not accept PursuitÂs offer to participate in Âthe
same interest.ÂÂ  However, McCordÂs own
summary judgment evidence (also attached to San SabaÂs
response) establishes that Pursuit took an assignment of only the oil and gas
below 9,765 feet, while the Sue-Ann lease earlier assigned to OÂSullivan
included the oil and gas both above and below that depth.Â  Thus, Pursuit did not (and could not) offer
San Saba an opportunity to participate in the same interest.Â  Accordingly,
McCord failed to conclusively negate the causation element of San SabaÂs breach-of-contract claim.Â  See IHS
Cedars Treatment Ctr. of Desoto v. Mason, 143 S.W.3d 794,
798 (Tex. 2004).

With respect to the no-evidence portion of the
summary judgment motion, McCord contends that San Saba failed to present any
evidence in response to its assertion that San Saba could produce no evidence
of causation because San Saba failed to direct the trial court Âto any specific
evidence.ÂÂ  

As set out above however, San Saba attached
excerpts from McCordÂs deposition which show that Pursuit did not (and could
not) offer San Saba an opportunity to participate in the same interest which McCord earlier acquired through OÂSullivan.Â  Thus, San Saba produced more than a scintilla
of evidence to establish causation.Â  See Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 600 (Tex.
2004).

PrestonÂs affidavit provides more than a scintilla of
evidence regarding the profits San Saba lost as a result of McCordÂs failure to
offer it a proportional interest in the Perez ranch and the Sue-Ann lease.Â  See Abraxas Petroleum Corp. v. Hornburg,
20 S.W.3d 741, 759-61 (Tex.
App.ÂEl Paso 2000, no pet.).

Accordingly, we sustain San SabaÂs
fourth issue.

We affirm the judgment as to San SabaÂs fraud claim, reverse the judgment as to San SabaÂs breach of contract claim, and remand this cause to
the trial court for further proceedings.

Â 

FELIPE REYNA

Justice

Before Chief Justice Gray,

Justice Vance, and

Justice Reyna

Reversed and remanded

Opinion delivered and filed April
 13, 2005

[CV06]








Â 











[1] Â Â Â Â Â Â Â Â Â  San
Saba named numerous other defendants in the suit as well.Â  However, the trial court severed San SabaÂs claims against McCord from its claims against the
other defendants.





[2] Â Â Â Â Â Â Â Â Â  According
to the purchase and participation agreement, Âthe LeasesÂ are the various oil
and gas interests within the AMI which the non-operators owned at the time they
entered the agreement.Â  Paragraph 1.3 of
the purchase and participation agreement defines the term ÂAdditional LeasesÂ
as Âleasehold interests, other than the Leases, acquired by LL&E (a)
covering any portion of the AMI prior to the Initial Well reaching Casing
Point, whether obtained pursuant to a Seismic Operation, other seismic option,
or otherwise or (b) pursuant to a Seismic Option at any time.Â 

Â Â Â Â Â Â Â Â Â Â Â  





[3] Â Â Â Â Â Â Â Â Â  The
last paragraph of Section A defines the partiesÂ rights and obligations if LLEC
acquires additional leases within the AMI.





[4] Â Â Â Â Â Â Â Â Â  The
operating agreement has a similar provision which states that it controls in
the event of a conflict, except with respect to the purchase and participation
agreement and the partiesÂ gas balancing agreement.





[5] Â Â Â Â Â Â Â Â Â  As
the 9th Circuit explained, ÂThe abbreviation Âi.e. . . . introduces another way
. . . of putting what has been already said. It does not introduce an example,
and when substituted for e.g. in that
function . . . is a blunder.ÂÂÂ  U.S. v. King, 849 F.2d 1259, 1260 (9th
Cir. 1988) (quoting H. W. Fowler, A
Dictionary of Modern English Usage 263 (Sir Ernest Gowers,
rev. ed., Oxford U. Press 1983)).